IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JOHN DOE, an individual, by and through his next friend, JENNIFER MARTIN

Plaintiff,

vs.

KATRINA FEWKES, MARTHA RUIZ PALACIOS, MARK LABOUCHARDIERE, NANCY KRUEGER, CINDY KROLIKOWSKI, SHAYLEE FORTNER, LUCAS JONES, FRED BOON, THOMAS FOSTER, and STEVEN HUFFMAN in their individual capacities,

Defendants.

CASE NO. 8:26-cv-639

**COMPLAINT, JURY DEMAND, AND REQUEST FOR PLACE OF TRIAL**

COMES NOW, John Doe (hereinafter "Plaintiff")—by and through his next friend Jennifer Martin and attorneys Keith Dornan, Stuart J. Dornan, and Jason N. Wendling of Dornan Law Team—for his Complaint, Jury Demand, and Request for Place of Trial. Plaintiff states and alleges as follows:

## INTRODUCTION

1. Plaintiff was 14 years old when he was groomed and sexually abused while entrusted to the care of the Nebraska Department of Health and Human

Services (hereinafter “DHHS”) at Nebraska’s Youth Rehabilitation and Treatment Center in Kearney (hereinafter “YRTC-Kearney”).

2. For years, a culture of sexual abuse, victim blaming, cover-ups, and retaliation existed at that facility. Staff members at YRTC-Kearney groomed numerous juveniles by giving them special treatment, compliments, and gifts. These predators used their power to exploit vulnerable individuals in the most heinous way possible. This was classic predatory behavior in an environment where the power dynamic between juvenile detainees and adult staff was absolute.

3. The purpose of the grooming was to exploit those juveniles for the sexual and psychological gratification of their predators. Predictably, grooming led to sexual abuse. When abusive or grooming behaviors were reported, DHHS employees at YRTC-Kearney engaged in token, ineffective, and counter-productive investigations the end result of which was to punish victims and protect predators. Allegations that staff abused juveniles were routinely met by disbelief, victim blaming and consequences for the victim—both official and unofficial.

4. Many, and perhaps even all juveniles housed at YRTC-Kearney was traumatized by the culture of grooming and sexual abuse at that facility but the victims of sexual abuse bore the brunt of it. Plaintiff has experienced trauma that will haunt him for the rest of his life, and he deserves justice and accountability from those responsible who directly abused him, those

who indirectly enabled that abuse through their deliberate indifference, and the State of Nebraska itself for allowing it to happen under its watch.

## JURISDICTION, VENUE, AND PARTIES

5. This Court has jurisdiction pursuant to the provisions of 28 U.S.C. § 1331 and 42 U.S.C. § 1983.
6. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) because this is the judicial district in which 1) all Defendants reside and in which state all Defendants reside, and/or 2) the judicial district in which a substantial part of the events giving rise to the claim occurred.
7. Jennifer Martin is John Doe's legal guardian and is a resident of Lancaster County, Nebraska.
8. Plaintiff was and remains a resident of Lancaster County, Nebraska. However, at the time of events giving rise to this action, Plaintiff was in the care and/or custody of the DHHS at YRTC-Kearney.
9. Defendant Ruiz Palacios was at all relevant times employed by DHHS at YRTC-Kearney as a Youth Program Specialist. She groomed and sexually abused Plaintiff. Defendant Ruiz Palacios is sued in her individual capacity and her actions alleged in this Complaint were done under color of state law.
10. Defendant Fewkes was at all relevant times employed by DHHS at YRTC-Kearney as a Youth Program Specialist. She groomed and sexually abused Plaintiff. Defendant Fewkes is sued in her individual capacity and her actions alleged in this Complaint were done under color of state law.

11. Defendant LaBouchardiere was at all relevant times employed by DHHS in the Office of Juvenile Services administrator and the DHHS facilities director. He was responsible for overseeing YRTC- Kearney and other DHHS facilities, including approving standard operating procedures for allegations of sexual abuse and reviewing reports of sexual abuse. Defendant Labouchardiere is sued in his individual capacity and the actions and/or inactions alleged in this Complaint were done under color of state law.
12. Defendant Krueger was at all relevant times employed by DHHS in the Office of Juvenile Services as the program manager. She was responsible for making standard operating procedures for allegations of sexual abuse. Defendant Krueger is sued in her individual capacity and her actions and/or inactions alleged in this Complaint were done under color of state law.
13. Defendant Krolikowski was at all relevant times employed by DHHS at YRTC-Kearney as the facilities administrator. Her duties included supervising all staff at YRTC-Kearney and reviewing critical incident reviews of all sexual abuse allegations. Defendant Krolikowski is sued in her individual capacity and her actions and/or inactions alleged in this Complaint were done under color of state law.
14. Defendant Fortner was at all relevant times employed by DHHS at YRTC-Kearney as a Prison Rape Elimination Act (hereinafter "PREA") compliance manager and later as the PREA facilities compliance administrator. She was responsible for conducting PREA investigations and ensuring that proper

procedures were followed to protect the health and safety of victims. Defendant Fortner is sued in her individual capacity and her actions and/or inactions alleged in this Complaint were done under color of state law.

15. Defendant Jones was at all relevant times employed by DHHS at YRTC-Kearney as a PREA compliance manager. He was responsible for conducting PREA investigations and ensuring that proper procedures were followed to protect the health and safety of victims. Defendant Jones is sued in his individual capacity and his actions and/or inactions alleged in this Complaint were done under color of state law.

16. Defendant Boon was at all relevant times employed by DHHS at YRTC-Kearney as the PREA Compliance Specialist. He was responsible for conducting PREA investigations and ensuring that proper procedures were followed to protect the health and safety of victims. Defendant Boon is sued in his individual capacity and his actions and/or inactions alleged in this Complaint were done under color of state law.

17. Defendant Foster was at all relevant times employed by DHHS at YRTC-Kearney as the PREA Compliance Specialist. He was responsible for conducting PREA investigations and ensuring that proper procedures were followed to protect the health and safety of victims. Defendant Foster is sued in his individual capacity and his actions and/or inactions alleged in this Complaint were done under color of state law.

18. Defendant Huffman was at all relevant times employed by DHHS at YRTC-Kearney as a unit manager. Defendant Huffman is sued in his individual capacity and his actions and/or inactions alleged in this Complaint were done under color of state law.

## ALLEGATIONS

19. The insidious culture of abuse that existed for years at YRTC-Kearney was created and enabled by the deliberate indifference of DHHS administrators and staff who routinely and inexcusably failed to follow the most basic procedures designed to protect the vulnerable youth in their care.

20. From the administrators at the very top of DHHS to the entry-level employees who worked at YRTC-Kearney, each of these defendants had training and procedures that—if followed faithfully—would have prevented nearly all of the tremendous harm done under their watch. By simply following the procedures designed to prevent and respond to sexual abuse, they could have at least mitigated any damage done. But the DHHS employees named here as defendants did the opposite of what they were entrusted to do, and Plaintiff has suffered the consequences to his lasting harm.

21. Every single defendant named had knowledge of the Prison Rape Elimination Act (hereinafter "PREA") standards that DHHS officially adopted. "A [DHHS] PREA Coordinator oversees, coordinates, and monitors the development and implementation of the PREA program. Every facility has a designated PREA

compliance manager, responsible for overseeing PREA implementation in their facility. Each facility undergoes a PREA audit once every three years, conducted by an auditor certified by the U.S. Department of Justice."[1]

22. "DHHS takes every allegation extremely seriously and investigates every allegation made. The department follows specific requirements and complies with procedures laid out in the American Correctional Standards (hereinafter "ACA"), PREA, and Nebraska Revised Statute 28-711 for reporting child abuse and/or neglect. Once an allegation of sexual abuse is reported, youth are immediately separated from an implicated staff member, and the staff member is escorted off the property. The youth is provided with immediate medical and mental health care. DHHS reports every allegation immediately to the child abuse and neglect hotline. All reports are sent to law enforcement for investigation, and the department cooperates fully with NSP. The Department follows protocol to notify the Office of Inspector General (hereinafter "OIG") immediately and works in partnership with probation to ensure they are notified. DHHS has a zero-tolerance policy towards all forms of sexual abuse, sexual harassment, or sexual assault. Staff are required to cooperate fully with investigations when allegations are made."[2]

23. Despite those assurances, DHHS employees at YRTC-Kearney routinely failed to protect the youth in their care. They routinely failed at an individual and institutional level to follow PREA. They failed to follow their

[1] https://corrections.nebraska.gov/news-information/prison-rape-elimination-act
[2] https://www.ketv.com/article/new-court-documents-and-hearing-reveal-more-from-the-yrtc-in-kearney/69035075

own operating procedures designed to protect against sexual abuse. Even more disturbing, DHHS administrators crafted operating procedures that deviated from PREA. While DHHS operating procedures purported to adopt the PREA standards, in reality, they created an arbitrary distinction between allegations of juvenile-on-juvenile sexual abuse, and allegations of staff-on-juvenile sexual abuse. Those operating procedures do not require that allegations that staff sexually abused juveniles be reported to parents, caseworkers, probation officers or attorneys. They are deliberately deficient procedures that kept allegations that staff had sexually abused juveniles from reaching the victimized juveniles' parents, attorneys, and the juvenile courts overseeing their cases.

24. DHHS could have implemented the already existing and promulgated PREA standards into their standard operating procedures, but they deliberately chose not to as to provide greater protection to DHHS employees to the detriment of the youth in their care.

25. For years, DHHS employees and administrators engaged in a pattern of minimization of allegations, late-reporting of allegations, a failure to properly investigate allegations, failure to keep investigations confidential, failure to take corrective actions, and a pattern of withholding the allegations from the very parties—parents, attorneys, and judges—who could have raised the alarm about systemic sexual abuse at YRTC-Kearney.

26. The failures by DHHS administrators and staff include, but are not limited to:

    a. promulgating Standard Operation Procedures that failed to meet PREA standards;
    b. failing to follow PREA standards;
    c. failed to properly screen employees;
    d. failing to properly train its employees;
    e. failing to properly supervise its employees;
    f. failing to properly investigate allegations of sexual abuse;
    g. failing to properly notify parents, attorneys, probation, and the juvenile court of allegations of sexual abuse;
    h. failing to take corrective and remedial actions to ensure allegations of sexual abuse were properly handled;
    i. failing to ensure victims of sexual abuse were given proper medical and mental health care;
    j. failure to create safety plans and monitor victims for retaliation;
    k. failure to properly conduct incident reviews;
    l. punishing victims of sexual abuse by placing them in isolation and using administrative punishments that prolonged their placement at YRTC-Kearney.

27. When allegations of sexual abuse were made involving staff, DHHS employees, including high level administrators, engaged in token

investigations that were not designed to uncover the truth or falsity of the allegations. Instead, those investigations were carried out in a manner designed to protect staff members.

28. Despite compelling evidence which existed in many cases, such as video recordings showing sexual abuse of a juvenile by staff, DHHS employees and administrators failed to properly discipline or terminate staff and protect victimized juveniles. Instead, DHHS employees minimized the abusive actions of staff, by giving them inadequate consequences such as counseling and training regarding "appropriate boundaries."

29. When DHHS employees disclosed PREA allegations to the Child Abuse/Neglect Hotline, (hereinafter "the Hotline"), they routinely minimized the veracity of the allegations, discredited the victims, and failed to correctly identify that sexual abuse had occurred. They routinely failed to give the Hotline all the information that was relevant to the investigation.

30. After administrative investigations were completed, DHHS administrators and staff failed to (1) conduct adequate reviews, (2) identify areas that were in "blind spots" that cameras did not record,(3) make and implement changes that addressed late reporting, (4) address the issue of staff providing juveniles with contraband, (5) ensure that PREA investigations remained confidential, (6) protect juveniles involved from retaliation from staff and other juveniles, (7) provide them with medical and mental health treatment,

and most importantly, (8) protect detained juveniles from further sexual abuse by authority figures.

31. The trauma experienced by Plaintiff and other victims of sexual abuse at YRTC-Kearney was aggravated by the fact that PREA compliance staff there did not receive specialized training in "techniques for interviewing juvenile sexual abuse victims" as required by PREA. Instead, PREA compliance staff were trained solely on the "Reid Technique" that many law enforcement agencies use to interrogate adult criminal suspects. The Reid Technique has been highly criticized for inducing unacceptably high rate of false confessions, especially from juveniles and people with mental impairments. Criticism has also been leveled in the opposite case—that against strong-willed interviewees, the technique causes them to stop talking and give no information whatsoever, rather than elicit lies that can be checked against for the guilty or exonerating details for the innocent. The use of the Reid technique in interviews with Plaintiff in lieu of techniques specifically designed for interviews with juvenile sexual abuse victims made it less likely that he would disclose the sexual abuse and more likely to cause him emotional distress – which is exactly what happened.

32. Even when allegations of grooming and sexual abuse were substantiated by video evidence, DHHS therapists, including Defendant Thomas either intentionally failed to provide appropriate services or they were kept in the dark about the sexual abuse by DHHS administrators who provided

incomplete, misleading, or false information that focused on rule violations by the juveniles and omitted allegations of sexual abuse. As medical director, Defendant Thomas should have been aware of the toxic culture of grooming and sexual abuse and acted to protect her patients. Either way, the result was the Plaintiff and other victims of sexual abuse did not receive proper physical and mental health treatment, often for extended periods of time.

33. Once DHHS closed its perfunctory investigations into allegations of sexual abuse, it would routinely punish the victimized juveniles by placing them in the “Dixon Behavioral Stabilization Unit” (hereinafter “DBSU”). DBSU is akin to the facilities in an adult prison and juveniles there are subject to increased confinement and isolation.

34. Juveniles were further punished by denying them privileges, such as earned steps towards their release, effectively prolonging their stay at YRTC-Kearney and ensuring their abusers access to continue abusing those juveniles. Other punishments included revoking their phone privileges, which denied these victimized juveniles an opportunity to disclose the abuse to their loved ones or other trusted individuals outside the control of DHHS. At YRTC-Kearney, if you alleged abuse the end result was that you were isolated from your loved ones and those who would protect you. That institutional response made it even easier for sexual predators employed by DHHS to prey on these already vulnerable youth.

35. At YRTC-Kearney, sexual abuse was permitted and covered-up while the victims were isolated and punished. Their abuse was not addressed through therapy or appropriate of mental health services. Their parents were repeatedly told that their loved ones were noncompliant with treatment, aggressive and unruly. The parents were often not told about the allegations of sexual abuse by staff in a timely fashion and were often intentionally misinformed or kept in the dark about any specifics.

36. The traumatic effect of the sexual abuse, ineffective investigations, inappropriate punishment, and denial of necessary trauma-related services had on the mental health of these victimized juveniles cannot be overstated.

37. While the abuse persisted at YRTC-Kearney, various individuals, such as juvenile public defenders, raised the alarm that the staff at YRTC-Kearney seemed overly familiar with the boys, at best, and flirtatious and inappropriate, at worst—and that was the conduct of staff when they knew an attorney was present. The interactions were described as having a teenage peer dynamic that was disturbing given the context, but those concerns were ignored by DHHS employees and administrators.

38. Each of the named defendants had training and specific information that gave actual notice of substantial dangers to the Plaintiff and every juvenile at YRTC-Kearney who lived in that toxic and abusive culture. Each had time, authority and an obligation to take protective action. Each disregarded the known risk described above and left Plaintiff exposed to sexual abuse by

Fewkes and Ruiz Palacios. Their own acts and omissions caused the constitutional injuries alleged here.

**ALLEGATIONS AGAINST MARTHA RUIZ PALACIOS**

39. Ruiz Palacios began to groom and sexually abuse Plaintiff in the Summer of 2025. For a period of approximately two months, Plaintiff was subjected to grooming and sexual touching by Ruiz, who touched his penis on multiple occasions. Ruiz also encouraged and allowed Plaintiff to touch her buttocks and breasts. Ruiz was able to groom Plaintiff, among other means, by giving him contraband presents, including a vape pen.

40. Plaintiff did not freely consent to Ruiz Palacios's sexual acts. She used her custodial authority, his youth and dependence, the favors she controlled, and the emotional dependence she cultivated to obtain his submission and secrecy. Her conduct served her own sexual gratification and desire for power and control. It had no treatment, rehabilitative, disciplinary, or other legitimate custodial purpose.

41. On July 25, 2025 Plaintiff was given the opportunity to go on an off-site visit with his mother. The two left YRTC-K, and went to Harmon Park. While they were at the park, a YRTC-Kearney staff member called and asked for their location. The location of Plaintiff was then disseminated to Ruiz Palacios who was then working her a shift at YRTC-Kearney. Ruiz Palacios left YRTC-Kearney, went to Harmon park, and while his mother was using the bathroom, approached Plaintiff, had sexual contact with him, and provided

him with a vape pen. Ruiz Palacios then left without the mother being aware of what occurred. When Plaintiff and his mother returned to YRTC-K, Plaintiff returned the facility with the vape pen and was caught with that contraband. Plaintiff was interrogated using the "Reid Technique" and due to his fear of retaliation did not disclose the truth. DHHS employees suspected the mother and searched her vehicle instead of investigating Ruiz Palacios.

42. As a result of being groomed by Ruiz Palacios and given contraband by her, Plaintiff was punished and sent to the Dixon Behavioral Stabilization Unit. He was isolated from his mother. He also had his level dropped, effectively prolonging his detention at YRTC-Kearney.

43. On August 2, 2025, it was reported that Plaintiff had been passing notes with Ruiz Palacios and had been seen kissing Ruiz Palacios. The incident was corroborated by video and the investigation was wrapped-up in a matter of hours.

44. But Plaintiff did not receive immediate mental health treatment or services. The mental health and therapy services Plaintiff received did not adequately address his victimization. He was not provided with an adequate safety plan or protected with any retaliation monitoring. He was not immediately given a Child Forensic Interview. DHHS did not immediately contact Plaintiff's mother, attorney, and probation officer.

45. Ruiz Palacios was subsequently charged and convicted for her conduct of sexually abusing Plaintiff.

## ALLEGATIONS AGAINST KATRINA FEWKES

46. Defendant Katrina Fewkes, a staff member at YRTC-Kearney was the subject of multiple allegations of sexual abuse and PREA allegations beginning at least as early as January 2024. YRTC-Kearney staff did not take proper action to investigate Fewkes, and protect youth at the facility from her sexual abuse. Fewkes had a reputation amongst youth at the facility for sexual abuse, grooming behavior and voyeurism. Yet when allegations were made against Fewkes it was the accusers who would ultimately be punished while Fewkes continued to work at YRTC-Kearney.
47. Beginning or around January 2025, Plaintiff began to be groomed and sexually abused by Fewkes. She called him "Daddy", gave him candy or other favors, and made sexual advances. At various times while in the Dixon Behavioral Stabilization Unit, Fewkes would encourage and allow Plaintiff to touch her breasts.
48. Plaintiff did not freely consent to Fewkes's sexual acts. She used her custodial authority, his youth and dependence, the favors she controlled, and the emotional dependence she cultivated to obtain his submission and secrecy. Her conduct served her own sexual gratification and desire for power and control. It had no treatment, rehabilitative, disciplinary, or other legitimate custodial purpose.
49. Plaintiff was the victim of sexual abuse by Fewkes that he was too scared to report until after he left YRTC-Kearney because he was scared of retaliation

from Fewkes, DHHS employees, and other youth at the facility. His experience at YRTC-Kearney living in that toxic environment taught him that disclosing the abuse would only lead to negative consequences for himself.

50. After being discharged from YRTC-Kearney, Plaintiff disclosed to his mother the abuse perpetuated by Fewkes, a Hotline call was made, and Plaintiff was given a Child Forensic Interview regarding Fewkes' sexual abuse.

**First Cause of Action — Defendants Fewkes and Ruiz Palacios: Eighth and Fourteenth Amendment Violations Under 42 U.S.C. § 1983 (Sexual abuse of a Juvenile)**

51. Plaintiff incorporates the above paragraphs as though fully set forth herein.

52. Plaintiff was not a convicted person because he was not convicted of a crime. Rather, Plaintiff was an "adjudicated individual." *See* NEB. REV. STAT. § 43-280 ("No adjudication by the juvenile court upon the status of a juvenile shall be deemed a conviction . . .").

53. At all times relevant, Plaintiff was held at YRTC-Kearney as an "adjudicated individual," and, thus, had the status equal to that of a "detainee."

54. As a detainee, Plaintiff's rights arise under the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States. *See Glover v. Paul*, 78 F.4th 1019, 1021 (8th Cir. 2023).

55. Plaintiff's rights as a detainee were "at least as great" as those available to a convicted person under the Eighth Amendment of the Constitution of the United States. *See Glover*, 78 F.4th at 1021.

56. Plaintiff had a right to be free from sexual abuse committed by correctional agents of DHHS under both the Eighth and Fourteenth Amendments of the Constitution of the United States.

57. This right has been and remains clearly established within the Eighth Circuit long before the events giving rise to this claim. *See, e.g.*, *Williams v. Prudden*, 67 Fed. Appx. 976, 978 (8th Cir. 2003) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)) ("Any reasonable corrections officer would have known in January 1999 that sexually assaulting an inmate would violate the inmate's constitutional rights"); *Kahle v. Leonard*, 477 F.3d 544, 553 (8th Cir. 2007) ("Without question, then, Kahle's constitutional right to be protected from being sexually assaulted by a guard was clearly established on December 14, 2002 . . ."); and *Glover*, 78 F.4th at 1022 (quoting *Kahle*, 477 F.3d at 553) ("it is clearly established that "the sexual assault of an inmate by a guard violates the inmate's constitutional rights.").

58. While Plaintiff was a "detainee" at YRTC, Defendants Fewkes and Ruiz Palacios groomed, kissed, permitted to be touched, and, ultimately touched Plaintiff for their own sexual and psychological gratification.

59. Defendants Fewkes and Ruiz Palacios objectively caused Plaintiff pain because Plaintiff felt violated, abused, unsafe, and other emotional distress from being sexually abused by Defendants Fewkes and Ruiz Palacios.

60. Plaintiff further suffered and continues to suffer from anxiety, mental anguish, flash backs, untrusting behavior towards females, untrusting behavior towards females in authority, mental blocks, and other pain from Defendants Fewkes and Ruiz Palacios' sexual abuse of Plaintiff.

61. The unnecessary and wanton infliction of pain by Defendants Fewkes and Ruiz Palacios establishes a constitutional violation.

62. Plaintiff further could not legally consent to such sexual contact because he was legally defined as a protected individual at the time of Defendants Fewkes and Ruiz Palacios' actions. *See* NEB. REV. STAT. § 28-322.04(2) ("It is not a defense to a charge under this section that the protected individual consented to such sexual penetration or sexual contact.").

63. Defendants Fewkes and Ruiz Palacios' actions were thus a bright line, knowing violation of the law because they 1) were on notice their actions were criminal pursuant to NEB. REV. STAT. § 28-322.04 and 2) were on notice their actions were not tolerated by their employer under YRTC-Kearney's zero-tolerance policy for sexual abuse and sexual harassment. *See* 28 C.F.R. § 115.331(a)(1) (2026) (discussing mandated training for employees within juvenile facilities which includes training on the facility's "zero-tolerance policy for sexual abuse and sexual harassment").

64. Defendants Fewkes and Ruiz Palacios failed to act in good faith and without malice toward Plaintiff's constitutional rights.

65. Defendant Fewkes and Ruiz Palacios' actions resulted in physical, mental, and emotional injury to Plaintiff as outlined in Plaintiff's Prayer for Relief.

**Second Cause of Action — Defendants Corsi, Labouchardiere, Krueger, Krolikowski, Fortner, Jones, Boon, Everett, Leffler, Huffman and/or Thomas, Eighth and Fourteenth Amendment Violations Under 42 U.S.C. § 1983 (Failure to Protect)**

66. Plaintiff incorporates the above paragraphs as though fully set forth herein.

67. Plaintiff had a right to be free from the deliberate indifference by DHHS staff to a substantial risk of serious harm under both the Eighth and Fourteenth Amendments of the Constitution of the United States.

68. This right has been and remains clearly established within the Eighth Circuit long before the events giving rise to this claim. *See Kahle v. Leonard*, 477 F.3d at 553–54 ("it has long been established in this Circuit and elsewhere that "[a] prison official may be held liable under the Eighth Amendment if he or she knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it" and "Thus, as of December 14, 2002, it was clearly established that a prison official could be held liable under § 1983 for exhibiting deliberate indifference to a substantial risk that a detainee would be sexually assaulted by a guard.").

69. While a detainee, Plaintiff was subjected to grooming and sexual abuse by two YRTC-Kearney employees. *See supra* First Cause of Action. When the conduct was uncovered, he was further traumatized when defendants failed to follow PREA procedures designed to protect him and provide him needed

services. Instead, he was interrogated and punished causing him further harm.

70. "The culture at YRTC-Kearney normalized inappropriate staff behavior, which the facility failed to sufficiently address." *Allegations of Sexual Abuse of Youth by Staff at the Youth Rehabilitation and Treatment Center at Kearney*, NEB. OFFICE OF INSPECTOR GENERAL, (Jul. 27, 2026) https://htv-prod-media.s3.amazonaws.com/files/oig-child-welfare-yrtc-kearney-report-6a6958e296de8.pdf.

71. Such inappropriate culture was so normalized that the Nebraska Office of Inspector General recommended "DHHS and YRTC-Kearney [] address the culture problem at the facility, including implementing operational and structural improvements to prevent staff sexual abuse and violations of professional boundaries with youth." *Id.*

72. Due to the "the number, breadth, and consistency" of PREA allegations at YRTC-Kearney, even going as far back to 2022, detainees at YRTC-Kearney—including Plaintiff—had a reasonable fear of being sexually assaulted by prison staff. *Id. See also Dean v. Bearden*, 79 F.4th 986, 989 (8th Cir. 2023) (quoting *Vandevender v. Sass*, 970 F.3d 972, 977 (8th Cir. 2020)) ("A risk of sexual assault is "substantial" if it "occur[s] with sufficient frequency that prisoners are put in reasonable fear for their safety.").

73. Thus, because of the culture at YRTC-Kearney, and because of the numerous PREA allegations and investigations, Defendants Corsi, Labouchardiere,

Krueger, Krolikowski, Fortner, Jones, Boon, Huffman and/or Thomas knew Plaintiff had a substantial risk of sexual abuse by YRTC-Kearney employees.

74. Despite this knowledge, Defendants Corsi, Labouchardiere, Krueger, Krolikowski, Fortner, Jones,, Boon, Huffman and/or Thomas failed to protect Plaintiff going so far as to provide Plaintiff's abuser—Defendant Ruiz Palacios—Plaintiff's out-of-facility location, delay reporting of PREA allegations at YRTC-Kearney to the Office of the Inspector General until August of 2025, and, overall, permitting four staff members , who have been criminally charged, to sexually assault youth, and permit three other staff members to sexually assault youth who have had PREA allegations substantiated to groom and sexually abuse juveniles under their cared. By permitting such rampant grooming and sexual abuse of minors, Defendants Corsi, Labouchardiere, Krueger, Krolikowski, Fortner, Jones, Boon, Huffman and/or Thomas knew their conduct was inappropriate in light of such substantial risks of sexual abuse.

75. Defendants Corsi, Labouchardiere, Krueger, Gordon, Krolikowski, Fortner, Jones, Thomas, Boon, Everett, Lefler, Huffman and/or Thomas failed to act in good faith and without malice toward Plaintiff's constitutional rights.

76. Defendants Corsi, Labouchardiere, Krueger, Krolikowski, Fortner, Jones, Boon, Huffman and/or Thomas' actions resulted in physical, mental, and emotional injury to Plaintiff as outlined in Plaintiff's Prayer for Relief.

**Third Cause of Action — Defendants Corsi, Labouchardiere, Krueger, Krolikowski, Fortner, Jones, Boon, Leffler, Huffman and/or Thomas, Eighth and Fourteenth Amendment Violations Under 42 U.S.C. § 1983 (Failure to Supervise)**

77. Plaintiff incorporates the above paragraphs as though fully set forth herein.

78. YRTC-Kearney had a normalized culture of inappropriate and criminal staff behavior that. *See supra* Third Cause of Action. That culture and the sexual abuse it enabled resulted in a pattern of unconstitutional acts performed by the subordinates of Defendants Corsi, Labouchardiere, Krueger, Krolikowski, Fortner, Jones, Thomas, Boon, Huffman, and/or Thomas.

79. The patterns of acts included, *inter alia*: engaging in sexual intercourse with detainees, engaging in oral sex with detainees, engaging in sexual stimulation of detainees' genitalia, touching detainees' genitalia, sending sexually explicit photos and videos to detainees, permitting detainees to touch staff members' buttock, hips, waist, and inner thigh, and other similar incidents. Defendants Corsi, Labouchardiere, Krueger, Krolikowski, Fortner, Jones, Boon, Huffman and/or Thomas were either deliberately indifferent to such pattern of unconstitutional acts and/or tacitly authorized such acts by their failure to stop the acts from continuing. *See supra* Second Cause of Action.

80. Defendants Corsi, Labouchardiere, Krueger, Krolikowski, Fortner, Jones, Boon, Huffman and/or Thomas failed to follow proper procedures for alleged sexual abuse by staff, and failed to take sufficient remedial actions to stop the

normalized culture of inappropriate staff behavior, including numerous sexual assaults and/or abuse of other detainees and Plaintiff.

81. Such failure to train the staff who perpetuated the normalized culture of inappropriate staff behavior was the proximate cause of Plaintiff's injury, as the failure to properly and continually supervise Defendant Ruiz Palacios and Defendant Fewkes allowed Defendant Ruiz Palacios and Defendant Fewkes to groom and sexually abuse Plaintiff.

82. Defendants Corsi, Labouchardiere, Krueger, Krolikowski, Fortner, Jones, Boon, Huffman and/or Thomas failed to act in good faith and without malice toward Plaintiff's constitutional rights.

83. Defendants Corsi, Labouchardiere, Krueger, Krolikowski, Fortner, Jones, Boon, Huffman and/or Thomas' actions resulted in physical, mental, and emotional injury to Plaintiff as outlined in Plaintiff's Prayer for Relief.

## Jury Demand and Place of Trial Request

Plaintiff hereby demands a trial by jury and respectfully requests such matter be tried in Omaha, Nebraska.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests this Court find Defendants' actions violated Plaintiff's rights under the Constitution of the United States of America as stated herein and enter judgment in Plaintiff's favor as follows:

a. Compensatory damages in an amount to be proven at trial for Plaintiff's physical, emotional and mental injuries and pain and suffering;

b. Punitive damages to punish and deter the reprehensible conduct alleged in this Complaint;

c. Reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

d. The costs of this action;

e. Additional damages as are proven at trial; and

f. Such other relief this Court finds just and equitable.

DATED this 19th day of October, 2026.

JOHN DOE, by and through next of friend
JENNIFER MARTIN,
Plaintiff
By: *_/s/ Keith Dornan_*

Keith Dornan, #27570
Stuart J. Dornan, #18553
Jason N. Wendling, #28821
Dornan, Breitkreutz, Dahlquist, & Klein, P.C., L.L.O.
1403 Farnam St., Ste. #232
Omaha, Nebraska 68102
T: (402) 884-7044
F: (402) 884-7045
keith@dltlawyers.com
stu@dltlawyers.com
jasonw@dltlawyers.com
*Attorneys for Plaintiff*